### HASTORF v. GREENWICH INS. CO.

(District Court, S. D. New York. June 4, 1904.)

1. MARINE INSURANCE—CONSTRUCTION OF POLICY—WATERS OF HUDSON RIVER.
   A marine policy on a scow contained the following provision: "Warranted by the assured to be employed exclusively in the freighting business, and to navigate only the waters of the Bay and Harbor of New York, the North and East Rivers, and inland waters of New Jersey." Held, that "North River" could not be extended by construction to include tributaries of the Hudson in the state of New York, and that there could be no recovery under the policy for an injury to the scow received while she was lying at a dock in Rondout creek, 2½ miles from the Hudson.

In Admiralty. Action on marine insurance policy.

Louis B. Adams, for libellant.

Butler, Notman, Joline & Mynderse and Frederick M. Brown, for respondent.

ADAMS, District Judge. This action was brought by Albert H. Hastorf against The Greenwich Insurance Company, on a marine policy covering a period from November 8, 1899, to November 8, 1900, to recover the loss suffered by him through an injury to his deck scow Alexandria, on the 26th day of May, 1900, while lying at a wharf on the south side of Rondout Creek, about 2½ miles from the Hudson River. This wharf belonged to the Metropolitan Crushed Stone Company, where the scow was taken to be loaded with crushed stone. After receiving part of her cargo, the bins gave way and large quantities of stone were thereby deposited upon the deck of the scow, causing her to sink and be otherwise injured.

An action was brought in this court against the Hudson River Stone Supply Company, which chartered the scow, and that Company brought the Metropolitan Company in by petition. The action was tried out and, as to negligence, dismissed as against both companies, on the ground (1) that no negligence was shown on the part of the

Supply Company and (2) because the Stone Company had sustained the burden of proof which rested upon it to show freedom from negligence. It was also held (3) that the scow man in charge was guilty of negligence in failing to remove her after he received warning of danger. Hastorf v. Hudson River Stone Supply Company et al. (D. C.) 110 Fed. 669, affirmed 114 Fed. 1019, 52 C. C. A. 566.

The insurance was kept alive by agreement and after the described action was decided unfavorably to the libellant, he brought this one upon his policy.

The principal part of the testimony in the action against described companies has been stipulated into this case and further testimony has been taken upon the issues here raised by the answer, as follows:

"Sixth: Further answering the said libel, and for a separate and distinct defense thereto the respondent avers that in and by the terms of the said policy of insurance issued by the respondent, the assured warranted that the said scow should be employed exclusively in the freighting business and should navigate only the waters of the Bay and Harbor of New York, the North and East Rivers and inland waters of New Jersey, with the privilege to use the dumping grounds off Sandy Hook and to go as far East as Huntington Harbor, Long Island; and the respondent avers, upon information and belief that at the time of the alleged damage the said scow was not in the waters within which the assured had warranted to navigate her, but was at or near Eddyville on Rondout Creek, in the State of New York, many miles inland from the North River.

Seventh: Further answering the said libel and for a separate and distinct defense thereto the respondent avers that in and by the terms and conditions of the said policy it was provided that the respondent should be exempt from all perils, losses and misfortunes or expenses consequent upon or arising from or caused by want of ordinary care and skill in navigating said scow, and upon information and belief the respondent alleges that the alleged loss was consequent upon or arose from, or was caused by the want of ordinary care and skill of the master of said scow in navigating said vessel in that, although warned in due time of the danger that the said bins would fall upon the scow, the master neglected to remove the scow.

Eighth: Further answering the said libel and for a separate and distinct defense thereto the respondent avers that the only adventures and perils which it took upon itself to bear under said policy of insurance were certain stated risks of the lakes, rivers, canals, fires and jettisons; and upon information and belief the respondent avers that the alleged damage was not an adventure or peril of the lakes, rivers, canals, fires or jettisons."

The policy provided that the vessel was

"Warranted by the assured to be employed exclusively in the freighting business, and to navigate only the waters of the Bay and Harbor of New York, the North and East Rivers, and inland waters of New Jersey. Privileged to use the dumping grounds off Sandy Hook and to go east as far as Huntington Harbor, L. I."

The policy further provided:

"Touching the adventures and perils which this Company is content to bear and take upon itself by this Policy, they are of the Lakes, Rivers, Canals, Fires and Jettisons, that shall come to the damage of the said vessel, or any part thereof. Excepting all perils, losses, misfortunes, or expenses consequent upon, and arising from or caused by the following or other legally excluded causes, viz.: * * * incompetency of the master or insufficiency of the crew, or want of ordinary care and skill in navigating said vessel, and in loading, stowing, and securing the cargo of said vessel. * * *"

The first question to be determined is, whether the vessel was, at the time of her injury, within the waters covered by the policy.

There can be no doubt that Rondout Creek is a different body of water from the North, or Hudson, River and that the language used does not, in terms, cover the locality in which this accident happened, but to a certain extent the creek is a continuation, or a tributary, of the river, and testimony was permitted for the purpose of ascertaining whether the former was intended to be covered. While the libellant strenuously insists that it was, his testimony to sustain the contention is weak. It consists of his own statements and those of two steamboat men and two insurance men, with a letter from the president of the respondent, defining the Hudson River.

In the letter, referring to another policy, the president said:

"Referring to the enclosed policy, $34,000, being insurance of $3,000 on the Barge 'Anna and Sarah,' which you have sent to us, stating that the assured has raised the question in relation to the Hudson River, we beg leave to say, that we are unable to understand why the question is raised, as the policy does not limit the navigation of the vessel to any particular part of the river and she is, therefore, privileged to use any part of those waters, which would include all points between New York Harbor and the city of Troy, as we believe Troy is the head of navigation of the Hudson River."

This letter has little, if any, bearing upon the question involved here.

The testimony of the libellant and the steamboat men is to the effect that the creek is subject to the rise and fall of the tide and is navigable up to and beyond the place where the boat was injured but it does not tend to establish the libellant's contention that the waters of this creek were intended to be covered by the policy. One of the insurance witnesses, an adjuster of marine losses, testified that the waters of the creek are considered the waters of the North River but on cross examination, it appeared that he had never written a policy, nor acted, in the business except as a broker. The other testimony was of no importance.

The president of the respondent was then examined, as witness for the respondent, and upon his attention being called to the warranty in the policy, testified that by the custom of underwriters, the tributaries of the river are not included within and as a part of the waters specifically mentioned in policies, except such as are included in the waters of the bay and harbor of New York, which would cover Newtown Creek, for example, and not Rondout Creek.

All the foregoing testimony was received tentatively, and subject to objection, but it has been considered. I conclude that it affords no aid to a construction of the policy, which is apparently plain and unambiguous in its meaning. I do not see how its language can be extended to cover this creek. It may be, that if the question here discussed, had been raised when the policy was issued, that the underwriters would have taken the view now contended for by the libellant but it was not presented.

The only cases I have been referred to bearing upon the contention here are: Pearson v. Commercial Union Assurance Co., 1 App. Cas. 498, and Birrell v. Dryer, 9 App. Cas. 345, and they seem to sustain the view that the court should not in such a case go beyond the provisions of the policy.

Pearson v. Commercial Co. was a case where a vessel was insured while lying in Victoria Docks, London, with liberty to go into dry dock. The vessel anchored between the Victoria Docks and the dry dock and while so anchored was destroyed by fire, one of the perils insured against. The issue was, whether the loss happened while the ship was covered by the policy and it was held that she was not covered while moored in the river for a collateral purpose.

Birrell v. Dryer is more in point. There the policy contained the words: "Warranted no St. Lawrence between the 1st of October and the 1st of April." The vessel was lost in the Gulf of St. Lawrence during the excluded period, but not in the river of St. Lawrence, and it was held that there could be no recovery under the policy because the whole St. Lawrence navigation, both gulf and river, was prohibited.

Lord Blackburn said (351-2):

"Reliance was placed by some of the judges below on the maxim *'fortius contra proferentem.'* I do not think the description of the district excluded can be considered as the words of one party more than the other. The ship-owner knowing where he is likely to employ his ship, and that he does not intend to use her in some district, generally puts on the slip a description of that district in order to induce the underwriters to agree to a lower premium.

I am by no means prepared to say that in some cases where the description of the excepted district is special, it may not be right to say that these are the words of the assured. But where the description is, like this, general, I think that the assured has a right to suppose that the underwriters understand that description as they ought to understand it. It is alike for the interest of assured and underwriters that the description should be definite; and that is attended to in the warranty 'no British America between the 1st of October and the 1st of April.' No one could imagine that there was a material difference in the risk between a voyage from the most northern part in the United States, and one from the most southern part of British North America, or between a voyage commenced on the last day which is not prohibited, and one commenced on the first day which is prohibited. But a fixed limit is agreed on to prevent disputes."

I must adhere to the description given in the policy and hold that the waters of Rondout Creek were not covered.

This conclusion renders the consideration of the other questions unnecessary.

Libel dismissed.